1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4  EDDIE LARUE                  4:17-cr-00588

5

6                           October 13, 2017
                           Houston, Texas
7                           10:48:36 a.m.

8

9

10           DETENTION HEARING / ARRAIGNMENT

11      BEFORE THE HONORABLE DENA HANOVICE PALERMO

12        UNITED STATES MAGISTRATE JUDGE

13  APPEARANCES:

14  For the United States      Sebastian Edwards, AUSA
                         United States Attorney's Office
15                        1000 Louisiana
                        Suite 2300
16                        Houston, Texas 77010

17  For the Defendant          Joshua Lake, AFPD
                         Federal Public Defender's Office
18                        440 Louisiana
                        Suite 1350
19                        Houston, Texas 77002

20  Court Clerk               Carol Felchek

21  Electronic Recording       Jesus G.
22     Operator               United States District Clerk's
                           Office
23                        515 Rusk
                        Houston, Texas 77002
24

25  Proceedings from official electronic sound recording;
  transcript produced by court approved transcriber.

1    Also Present                    Sergio Garza
                                     Pretrial Officer
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2                                                    <u>Page</u>

3      <u>WITNESS FOR THE GOVERNMENT</u>:

4          Charles Sadowski

5              Direct Examination by Mr. Edwards      4
               Cross Examination by Mr. Lake         16
6              Redirect Examination by Mr. Edwards   34

7


8

       <u>EXHIBITS</u>:
9
           G-1      phone extraction report       14
10


11

       <u>ARGUMENT</u>:
12
       By Mr. Edwards      36
13     By Mr. Lake         36

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  I call United States of America versus

2  Eddie Larue or Eddie Larue, 17-cr-588.

3      UNIDENTIFIED SPEAKER:  It's case Number 11, so

4  everyone might not be in attendance, so.

5      THE COURT:  We'll take a ten-minute recess while you

6  all set up.

7      MR. EDWARDS:  Thank you.

8    (Recess taken at 10:48:37.)

9    (Proceeding resumed at 11:01:35 a.m.)

10     THE COURT:  All right.  Are we ready to proceed?

11     MR. EDWARDS:  Yes, Your Honor.

12         Just for the record, Your Honor, Sebastian

13  Edwards for the United States.

14     MR. LAKE:  And Joshua Lake for Mr. Larue.

15         And I don't know how many witnesses the

16  Government has, but if it's more than one I would ask that

17  they be sequestered when they are not testifying.

18     MR. EDWARDS:  Just one witness, Your Honor.

19     THE COURT:  Okay.  Do you want to proceed?

20     MR. EDWARDS:  Yes, Your Honor.

21         The Government calls Officer Charles Sadowski.

22     COURT CLERK:  Raise your right hand.

23    (Witness sworn.)

24     THE COURT:  You can be seated.

25         Hi, how are you?

1          THE WITNESS:  Okay.

2          MR. EDWARDS:  Your Honor, would you like me to stand

3   or sit during the questioning?

4          THE COURT:  However you want.  As long as you talk

5   into the microphone so I can hear you.

6          MR. EDWARDS:  Yes, Your Honor.

7        CHARLES SADOWSKI, GOVERNMENT'S WITNESS, SWORN

8                     DIRECT EXAMINATION

9   BY MR. EDWARDS:

10  Q   Good morning, Officer Sadowski, could you please state

11  your name and spell your last name for the record?

12  A   My name is Charles Sadowski, spelling of the last name,

13  S-A-D-O-W-S-K-I.

14  Q   Okay.  And could you please state your professional title?

15  A   I'm a detective with the Houston Police Department, Human

16  Trafficking Unit.

17  Q   How long have you been a detective?

18  A   Three years.

19  Q   And could you please describe, briefly describe your

20  responsibilities?

21  A   Of being part of the Human Trafficking Division, we deal

22  with anything related to prostitution, aggravated

23  prostitution – aggravated promotion of prostitution,

24  compelling prostitution, promotion of prostitution, anything

25  of the – I can't even – I'm sorry my brain is not functioning

1  this morning.

2  Q   Could you – could you just tell us during the course of

3  your three years how many cases you've investigated regarding

4  child exploitation or sex trafficking?

5  A   I believe the child exploitation probably around twelve as

6  of right now, I think.  I'm not positive of that number.

7  Q   Okay.  And how about trafficking?

8  A   I couldn't give you – there's quite a few.  I just can't –

9  I can't pull a number off the top of my head.

10  Q   Okay.

11           THE COURT:  More than ten?

12           THE WITNESS:  Yes, ma'am.

13  BY MR. EDWARDS:

14  Q   And could you please explain how you began your

15  investigation into the – this sex trafficking allegations in

16  which Mr. Eddie Larue is the subject?

17  A   Yes, sir.  On June 5th, we were at the office at HPD,

18  Human Trafficking office.  Part of the task force from the

19  guys – Investigator Hall he's with Fort Bend County DA's

20  Office reached out to us saying that he's been in contact with

21  a runaway's mother.  The mother contacted him saying that you

22  missing Jane Doe would be – is missing and they – the

23  Godparents of Jane Doe said that she was going to be at 3500

24  Telephone Road.

25           At that point, me and the team – me and my team

1  of the Human Trafficking Unit, along with FBI Innocence Lost

2  and along with Investigator Hall went to Telephone Road and

3  hit her up on a social media App or tried to get in contact

4  with her through a social media App.  It was KIK; it's like a

5  texting application.  At that point, she responded to us.

6              Investigator Hall could not take over that,

7  because he's been in another investigation involving the

8  juvenile, so she – he's – she has seen him, so.  That's how I

9  became a part of this investigation.  I was the UC, undercover

10 officer in the case.

11             She agreed to meet me.  We went – she texted me

12 through KIK to meet her at a hotel.  I said, where is that?

13 She gave me a specific address.  It took a little few minutes

14 to walk across the street, but through the communication she

15 said she would be wearing a white phone charger around her

16 neck.  And so, I see – and when I see her – sorry – I may be

17 talking a little fast.  I'm sorry.

18             THE COURT:  Okay.

19             THE WITNESS:  When I see her, I flash my lights.  So,

20 I flash my lights; I see this girl with a white phone charger

21 cord around her neck.  I flash my lights.  She gets in the

22 car.  A few minutes conversation leads to a prostitution case.

23 BY MR. EDWARDS:

24 Q   Okay.  So, you set up a date with her – an approximate

25 date for the purpose of commercial sex?

1    A    Yes, sir.

2    Q    Okay.  And she was ultimately arrested?

3    A    Yes, sir.  She was.

4    Q    Okay.  And was she subsequently interviewed?

5    A    Yes, sir.  She was.

6    Q    Okay.  And could you please explain during that interview

7    what information she gave you that led you ultimately to the

8    Defendant, Mr. Eddie Larue?

9    A    She felt more comfortable talking to a female, so that is

10   where my partner, Special Agent Gordon, had a prior

11   relationship with her and another – uh, excuse me – sorry –

12   another case.  So, as soon as – as soon as the prostitution

13   case was made and Jane Doe was –

14   Q    Well, let me just back up real quick.

15   A    Yeah.

16   Q    How old is Jane Doe?

17   A    Twelve years old, sir.

18   Q    And are you aware if she was at school at the time?

19   A    I am not aware.  I don't – I don't know if she was or not.

20   Q    Is she at school currently?

21   A    I'm not sure.

22   Q    Okay.  Can you please explain what she told you all

23   regarding how she met Mr. Larue?

24   A    Yes, sir.  At the beginning when she was – when she was

25   being interviewed, she stated that hey, hey, I got something

1  to tell you.  And it wasn't to me.  But my partner relayed the

2  information to me.  She said that at the point, hey, I got

3  some – Miss – Miss – "Special Agent, I got something to tell

4  you."

5              "Okay."

6              So, then, basically, she said, I was choked.

7  And so, she started –

8          THE COURT:  She said she was what?

9          THE WITNESS:  Choked.

10         THE COURT:  Choked.

11         THE WITNESS:  So, at that point start- -- some more

12 questions started coming up, and then, she started going into

13 the whole – her whole story.

14             So, she left June 2nd.  She ran away from home –

15 she was walking down a street.  She met a gentleman that goes

16 by "E."  He took her to a local hotel right around – right

17 around the corner, and –

18 Q   And what was the name of that hotel; do you recall?

19 A   Motel 8.

20 Q   Okay.  And what happened at the hotel?

21 A   She performed oral sex on him.

22 Q   Okay.  And then, what?

23 A   And then, she showered.  Then after that he let her rest

24 for a few minutes, a couple of hours maybe.  Then he took her

25 to the Bissonnet track.

1    Q    And what is the – what is the track?

2    A    The track is a well-known portion on Bissonnet between 59

3    and the Beltway where prostitution and girls just walk up and

4    down the street.  Guys honk their horns; they get in the car.

5    And pretty much prostitution happens there.

6    Q    And this would have been around what – on what date that

7    he took her to the track?

8    A    I believe it was the 3rd.

9    Q    And could you please explain what she told you regarding

10   what – what she did on the track?

11   A    Yes, sir.

12             She met up with – I can't remember – I think – I

13   think it – I believe it was three – three different people

14   that she had sex with, and then she met up with "E" around the

15   corner and presented the money to him.

16   Q    And did she explain what sexual acts she performed and how

17   much money she made for each sexual encounter?

18   A    She did, but as of right now I'm drawing a blank on the

19   figures.  But I believe it was around a hundred and twenty

20   dollars.

21             THE COURT:  For all three together?

22             THE WITNESS:  Yes, ma'am.

23   BY MR. EDWARDS:

24   Q    And were these sexual acts three individuals at once, or

25   was it three separate sex – commercial sex acts encountered?

1  A    Three separate.

2  Q    Did she explain how long she was out on the track?

3  A    No, she didn't.  I - honestly, I don't remember if she did

4  or not.

5  Q    And did she talk about her interactions with - with the

6  Defendant, Mr. Eddie Larue - Larue; how did they communicate

7  while she was on the track?  Where was he, and where was she?

8  A    He was - he was in the area.  They communicated through

9  text messages or - and sometimes phone calls, but mainly

10  through text messages.

11  Q    All right.  And were you able to obtain those text

12  messages?

13  A    Yes, sir, we were.

14  Q    And how were you -

15            THE COURT:  I'm sorry.  Can we stop for one second?

16            Are you saying that this person, "E," who she

17  met up with initially was the Defendant, Mr. Larue?

18            THE WITNESS:  Yes, ma'am.

19            THE COURT:  Okay.

20            I don't think that got established.

21            Did you - were you leading up to that?  It's

22  just that - I'm - I don't want to - I don't want to be

23  confused.

24            MR. EDWARDS:  Yes, Your Honor.

25            THE COURT:  Okay.

1         Go ahead.

2    BY MR. EDWARDS:

3    Q   Were you able to obtain the text messages between Jane Doe

4    and the Defendant, Mr. Eddie - Eddie Larue?

5    A   Yes, we were.  She consented to a cell phone - cell

6    phone - she gave us the cell phone, and we were allowed to

7    obtain the records and everything on that cell phone.

8    Q   And could you please explain how you were able to verify

9    that the phone number she was texting to - to and from is -

10   was the phone of the Defendant?

11   A   Yes, sir.  When we picked her up on June 5th or rescued

12   her - excuse me - rescued her on June 5th, she says, I have

13   him in my phone - I have "E" in my phone as Daddy, because

14   that's what he wanted me to call him.

15             Then we - she showed Daddy on the phone; we were

16   able to obtain a phone number from that.  We ran that phone

17   number through a law enforcement application, which came back

18   to registered owner as Charles Eddie Larue.

19   Q   And did Mr. Larue at any time verify that the phone number

20   you associated with him was his actual phone number?

21   A   Yes, sir.  He did.

22   Q   And that - and how did that happen?

23   A   When we were - me and my partner were interviewing him at

24   first he kind of lied and said, he didn't have a phone; he was

25   using his mother's phone.  But then, he says, yes, that is my

1  phone number.  And – so, he did have a phone number.  We were

2  able to have him state his phone number, and he did.

3  Q   All right.  Officer Sadowski, I'm handing you Government

4  Exhibit 1 for identification.  Do you recognize this document?

5  A   Yes, sir.  I do.

6  Q   And he – what is it?

7  A   It is the extraction report that we received from her

8  phone.

9  Q   Now, if you – could you please – I want to direct you to

10  line 27 from the report.

11          THE COURT:  Do you have a copy for me?

12          MR. EDWARDS:  I'm sorry.

13  BY MR. EDWARDS:

14  Q   I'm directing you to line 27 of the report, and if you

15  could please refer – read, chronologically you have to read up

16  to line 21.

17  A   Yes, sir.

18  Q   Those exchanges identifying Jane Doe and identifying Daddy

19  and what those messages state.

20  A   Okay.

21          This is – this is to Daddy, and it reads,

22  "I am on the street where you dropped me off at."

23          This is from Daddy; "Okay.  Be there in five

24  minutes.  If you get a lick, take it."

25          To Daddy, "I –"

1       From Daddy, "Don't talk to nobody unless they're

2  trying to spend some money …."

3       123, to Daddy, "Okay."

4       To Daddy, "How much if somebody wants to eat me

5  out?"

6       From Daddy, "Forty."

7  Q   Okay.  Thank you.

8  A   Yes, sir.

9  Q   And what do you take the phrase – what – "how much if

10  somebody wants to eat me out" mean to you?  What does that

11  mean?

12  A   That means is that somebody is paying her for sexual

13  services.

14       MR. EDWARDS:  Your Honor, the Government would like

15  to offer this phone extraction report in evidence.

16       THE COURT:  Yes.

17       MR. EDWARDS:  Thank you.

18       MR. LAKE:  I'll note we have no objection for this

19  hearing.

20     (Government Exhibit No. 1 offered and admitted into

21  evidence.)

22  BY MR. EDWARDS:

23  Q   Officer Sadowski, did – did Jane Doe at some point

24  identify Mr. Larue?

25  A   Yes, sir, she did.

1    Q    Can you – could you please explain how she did?

2    A    Yes, sir.  We were following up at the CAC to do a

3    forensic interview –

4              THE COURT:  CAC is?

5              THE WITNESS:  The Child Assessment Center, ma'am.

6                   During that interview, my partner, Officer Ed

7    Lopez – I created the photo array of six – six males with the

8    same general characteristics as Mr. Larue.  Then, I presented

9    him – he had no knowledge of anybody in – didn't know anybody

10   in the photo array – I presented him in a packet; I left the

11   room.  He presented it to Jane Doe, and immediately she

12   circled out Charles Eddie Larue as her trafficker.

13   BY MR. EDWARDS:

14   Q    Did she ever indicate that he used force at any time to

15   compel her into prostitution?

16   A    Yes.  But I'm drawing a blank right now, but I – yes.

17   Q    All right.  In terms of anything corroborating her story,

18   were there any hotel receipts or other hotel surveillance you

19   were able to obtain?

20   A    Oh, yes, sir.  Motel 8, we were able to receive business

21   records, which is just a piece of paper stating – with his

22   name on it stating that he was there.  Then, at the Frontier

23   Inn we were able to also obtain business records, along with

24   video footage of Jane Doe walking out of a hotel room.

25   Immediately a few seconds later, Mr. Larue was following her

1  right after.

2  Q   Now, when these offenses occurred, is it your

3  understanding that Mr. Larue was on parole for a previous

4  offense, a previous drug offense?

5  A   When we ran his criminal history, yes, we found out that

6  he was on parole for – I believe it was possession of a

7  controlled substance.

8  Q   Do you recall what that controlled substance was?

9  A   It was methamphetamines.

10  Q   And were you able to determine whether he was affiliat- --

11  Mr. Larue was affiliated with any gangs?

12  A   Yes, sir.  When you run his criminal history, it pops up,

13  "Caution gang member."  And it was – his gang is Mach Mode;

14  it's a street gang in Southwest Houston.

15          MR. EDWARDS:  I have nothing further, Your Honor.

16          THE COURT:  Okay.

17                      CROSS EXAMINATION

18  BY MR. LAKE:

19  Q   Good morning, Officer.

20  A   Good morning.

21  Q   I want to start by asking you that this young girl told

22  you that "E" was not the only man that she had been with since

23  she ran away, correct?

24  A   Was not the only man?

25  Q   Correct.

1            She told you that she met with a man named Jay,

2    stayed with him at times, correct?

3    A    Yes.

4    Q    That there were other men she would contact on social

5    media to stay with them in exchange for sexual favors?

6    A    I don't know about the sexual favors but to stay with

7    them, yes.

8    Q    And the only time that she mentioned interacting with "E"

9    was between June 2nd and June 4th of this year?

10   A    Yes.

11   Q    So, she didn't allege that he had pimped her out on any

12   other occasion other than that three-day stand?

13   A    Yes, sir.

14   Q    And I want to direct your attention back to the text

15   messages that you were describing.

16   A    Yes, sir.

17   Q    There's forty-two messages between those two numbers,

18   correct?

19   A    I believe so.  I'm not sure, though.

20   Q    If it says, forty-two on the document you just looked at

21   that would be accurate?

22   A    If it says that, yes, sir.

23   Q    And it also is correct that the very first message between

24   those two numbers is June 3rd, at 9:33 a.m.?

25   A    I didn't – do you have a copy of it so I can look at it

1  again?

2  Q   Do you not still have it in front of you?

3  A   No, sir.  I do not.

4         MR. LAKE:  May I approach the witness?

5         THE COURT:  Yes.

6         THE WITNESS:  Sorry I don't –

7         MR. LAKE:  That's all right.  I thought you had it in

8  front of you.

9         THE WITNESS:  No, sir.

10  BY MR. LAKE:

11  Q   So, I'm showing you the same document.  I believe it's

12  marked Government's Exhibit 1.  Line 42 would be the first in

13  time.  It says, June 3rd, 9:33 a.m.; is that right?

14  A   Yes, sir.  It is.

15  Q   And the latest would be Line No. 1, which says June 4th,

16  at 11:21 a.m.

17  A   Yes, sir.

18  Q   Okay.  And so I'm correct in believing those are the only

19  messages between those numbers, as far as her phone indicated?

20  A   I believe so.  I think those are the only ones, yes, sir.

21  Q   Okay.

22                 And when you say this document, is the

23  extraction report from the phone – this is actually only a

24  small portion of what came off her phone, right?

25  A   Yes, sir.

1  Q    Okay.  So, this was limited to show only contact with this

2  phone number?

3  A    Yes, sir.

4  Q    The one labeled "Daddy"?

5  A    Yes, sir.

6  Q    It's fair to say there's many other messages on that

7  phone?

8  A    Yes.  With a typical team, there's quite a few messages.

9  Q    Okay.  I just wanted to be clear.  This is not all the

10 messages from the phone?

11 A    No, you're correct, sir.

12 Q    I want to ask – you said that on June 5th you reached out

13 to this girl through KIK.

14 A    Yes, sir.

15 Q    How did you or others know how to find her on KIK, how to

16 find a user name?

17 A    Oh, yes, sir.  Basically, on June 5th, Investigator Hall

18 with the DA's office from Fort Bend received a phone call from

19 Jane Doe's mother.  The mother – the Godparents of Jane Doe

20 were in contact with her through social media, and they were

21 able to obtain the KIK handle.

22 Q    Okay.  Do you know that handle?

23 A    Not off the top of my head, no, sir.

24 Q    Is it recorded in the report somewhere?

25 A    It is.

1    Q    Okay.

2                    With Investigator Hall, you said that he's

3    previously investigated this same girl?

4    A    I believe it was a runaway report, but I'm not sure.

5    Q    So, previous runaways?

6    A    Yes, sir.

7    Q    Okay.

8                    And it's correct that on June 5th, when the

9    report was filed about a runaway – oh, I'm sorry June 2nd.  I

10   misspoke.

11                   On June 2nd when she ran away, that was at least

12   the fifth time that law enforcement had been called because

13   she ran away?

14   A    I be- -- I believe so.

15   Q    You also said – and I believe it was Special

16   Agent Gordon – do I have the name right – that had some

17   familiarity with this girl?

18   A    Yes, sir.

19   Q    What – how did she know this – this victim?

20   A    Okay.  Like I – like I mentioned before on a previous

21   case, it was a runaway but may have to do with prostitution,

22   so Investigator Hall reached out to Innocence Lost Task Force,

23   which Special Agent Gordon is assigned to and asked them – her

24   and her partners to interview the – the victim.

25   Q    Okay.  So Special Agent Gordon had previously been

1  involved in a different time when this girl ran away and

2  prostituted?

3  A    Yes.   They – they – they had some familiarity with each

4  other.

5  Q    Is there any evidence or belief that Mr. Larue was

6  involved in that prior prostitution?

7  A    At that prior time?   No, sir.

8  Q    Okay.

9             Do you have, or are you aware of any other

10  recorded communications between Mr. Larue or his phone number

11  and this victim, other than the 42 text messages?

12  A    I am not aware.

13  Q    Okay.   In one of the reports that I Have been able to

14  review it says that this girl was taken to a hospital for

15  what's called a SANE exam, Sexual Assault Nurse Exam; are you

16  aware of that?

17  A    Yes, sir.

18  Q    And do you know if the results of that exam have been

19  received?

20  A    I'm not sure.   I think they have, but I'm not – I don't

21  know if they have or not.   I'm not sure.

22  Q    But you're not aware of anything in that exam that would

23  prove Mr. Larue – Larue had sexual contact with the girl?

24  A    Uh- --

25  Q    To your knowledge?

1  A    I couldn't – honestly, I don't know, sir.

2  Q    Okay.

3              I want to come to what you talked about the

4  surveillance at the Frontier Inn.

5  A    Yes, sir.

6  Q    And I've seen some of those videos.  A couple of

7  questions – the first it is, did you or other officers recover

8  the actual surveillance video, because what I have seen is

9  someone filming another screen that has it on there.  Do you

10 understand what I'm asking?

11 A    Yes, sir, I do.

12 Q    So, do you – have you recovered the original videos?

13 A    I think we have, but it was – for some reason it wouldn't

14 play, so the best way for me to capture that would be to – to

15 have that like – like you said the snapshot of it, of that

16 video.

17 Q    Okay.  But it's in law enforcement's possession somewhere,

18 just you couldn't make it play?

19 A    Right.

20 Q    Okay.  And you're familiar with the videos that we're

21 talking about; you've watched them?

22 A    You're talking about the Frontier Inn, sir, right?

23 Q    Right.

24 A    Yes, sir.

25 Q    Okay.  And so, you're aware that in one of the camera's

1 angles you're looking at a hallway inside the Frontier Inn?

2 A  Yes, sir.

3 Q  And the people you described are not the only two

4 individuals in the video.  You said one you believe is this

5 girl, and one you believe in this is Mr. Larue, but there are

6 also multiple other men and women at the same time?

7 A  Yes, sir.

8 Q  Okay.  Do you believe that any of them is connected to

9 this prostitution?

10 A  No, sir.

11 Q  Okay.  Do you think that they knew either Mr. Larue or

12 this girl?

13 A  I couldn't tell you if they did.  I don't know.

14 Q  Okay.  Then, I want to ask you about the second camera

15 angle.  There is another camera outside the Frontier Inn that

16 shows the parking lot.  Are you familiar with that video?

17 A  Yes, sir.

18 Q  Okay.  There is at one point a vehicle that looks to be

19 white that two individuals get into and it backs out and

20 leaves.  Do you know what I'm talking about?

21 A  I - I'm - I'm vaguely remembering, yes, sir.

22 Q  And I believe you testified that you think Mr. Larue and

23 this girl got into a vehicle and left, right?

24 A  Yes, sir.

25 Q  Have you or any other officer to your knowledge identified

1  that vehicle and who it belongs to?

2  A   I don't believe we have yet.

3  Q   Okay.

4            You mentioned that this girl is twelve years

5  old.  How has her age been verified other than the statements

6  of either her or others?

7  A   Like I mentioned before, uh, through prior reports and

8  stuff, through her mother listing her as a runaway and through

9  the documentation of that report verifying her age that way

10 and when she stated to us her date of birth.

11 Q   So, let me be clear.  She has told you her date of birth,

12 right?

13 A   Yes, sir.

14 Q   Her mother has told you a date of birth?

15 A   Yes, sir.

16 Q   And there are prior police reports that document those

17 statements?

18 A   That document her date of birth, her age, yes, sir.

19 Q   So, my question to you is, is there any original document

20 that verifies her age that you have seen – a birth

21 certificate, license, I.D., anything of that nature?

22 A   I have not seen that yet.

23 Q   Okay.

24            With KIK, I'm going to come back to that,

25 because I missed something I meant to ask you.

1          Have you or any other officers requested or

2    subpoenaed records for the account that used her user name?

3    A    For KIK, I know we used Moco's; we have subpoenaed

4    Mocospace or drafted a search warrant for them.  KIK I do not

5    believe so.

6              THE COURT:  What is Mocospace?

7              THE WITNESS:  It's another social media like Facebook

8    kind of thing, but a texting App.

9              MR. LAKE:  And that would be my next question, Your

10   Honor, if I could.

11             THE COURT:  Go ahead.

12   BY MR. LAKE:

13   Q    You – that's the first time today you've said Mocospace, I

14   believe, but it's throughout the reports?

15   A    Yes, sir.

16   Q    I'd like you to elaborate on what the girl's involvement

17   was with Mocospace; why you think it's important to this

18   investigation.

19             THE COURT:  And how do you spell that?

20             THE WITNESS:  M-O-C-O-S-P-A-C-E.

21             THE COURT:  Okay.

22   BY MR. LAKE:

23   Q    So, if you would elaborate on what the girl's usage of

24   that was and why you think it's relevant to this case.

25   A    Oh, yes, sir.

1          When – when we were in – when she was being

2    interviewed she stated that she had a quota of $200, and so if

3    she didn't make that quota on the street – on the Bissonnet

4    tracks so when – when she was taken back to the hotel by "E"

5    she was told to get on Mocospace and make some dates.

6    Q    And you are aware that she had been on Mocospace before he

7    was ever involved with her?

8    A    Yes, sir. she's been on Mocospace.

9    Q    And you are aware that she solicited men; she basically

10   offered herself the same way before "E" was ever involved?

11   A    I believe so, yes, yes.

12   Q    And you said that a search warrant has been drafted.  Do

13   you know if there are any records from Mocospace in law

14   enforcement's possession?

15   A    I believe we – prior to coming here we received them.

16   Q    Oh –

17   A    So – sorry.

18          THE COURT:  You received the records?

19          THE WITNESS:  Yes, ma'am.

20   BY MR. LAKE:

21   Q    I was a little unclear with what you said about the time

22   that you rescued her, that date was June 5th?

23   A    Yes, I – yes.

24   Q    Okay.

25          At the time that you got – were you personally

1  involved in that?

2  A    I was – I was the –

3  Q    Other than the –

4  A    I was the Undercover officer, sir.

5  Q    Yes, I'm sorry.  I should have been more clearer.

6              You were the one in the vehicle with her.

7  A    Yes, sir.

8  Q    And you said at that point she was arrested.  Did you stay

9  involved, or as soon as she left the car were you done?

10 A    I was in the – I was in the shadows.  Basically, she was –

11 she was pulled out of my vehicle, taken into custody, and then

12 I drove off to do some other investigating for this case, yes,

13 sir.

14 Q    So, then I'll ask you – it may not be your personal

15 knowledge, but if you're aware through investigation – on that

16 date do you know what was in her possession?

17 A    A white phone charger and a cell phone.  I –

18 Q    Do you know if she had any money?

19 A    I don't know if she did or not, no, sir.

20 Q    Okay.  If she did it would be documented somewhere?

21 A    I – I – I don't know if she had money or not, sir.  I

22 don't know.

23 Q    Do you know if she had any condoms?

24 A    I don't know.  I don't think – I don't think she did.  I'm

25 not sure, though.

1  Q   When she got into your car, you said the phone charger,

2  but did she have a phone?

3  A   Yes, sir.  She did.

4  Q   Okay.  And that's the phone you guys later went through?

5  A   Yes, sir.

6  Q   You described this girl going to the track on what you

7  believe to be June 3rd and said that she met with about three

8  men; do you remember that?

9  A   Yes.  Yes, sir, I believe.

10 Q   During that time – I'd like you to just be clear – where

11 do you believe that "E" was when she was meeting with those

12 other three men?

13 A   I couldn't tell you where he was, but through the text

14 messages he – I don't know where he was, but normally, through

15 my prior investigations, they typically the males are – the

16 males stay in the area.

17 Q   But you don't know in this case.

18 A   I do not know, no, sir.

19 Q   But you do know that he wasn't in the room when this was

20 occurring.

21 A   In what room, sir?

22 Q   In whatever room she was when she met with these three

23 men.

24 A   That was on the Bissonnet track, sir.  There is no rooms

25 on the track.

1   Q   So, it was just in cars?

2   A   Yes, sir.

3   Q   Okay.  I just wanted to be clear.

4   A   No, no, you –

5   Q   I'm sorry.  I misunderstood you.

6                   Then, you were involved when Mr. Larue was

7   arrested; is that right?

8   A   Yes, sir.  I was.

9   Q   And you're actually one of the two officers that

10  interviewed him?

11  A   Yes, sir.

12  Q   And at that time, Mr. Larue had a phone; do you remember

13  that?

14  A   Yes, sir.

15  Q   Do you know if that phone is still in law enforcement's

16  possession?

17  A   It is in law enforcement's possession.

18  Q   And do you know if a similar extraction report has been

19  prepared from that phone?

20  A   It has.

21  Q   And do you know whether that was pursuant to a warrant or

22  not?

23  A   It was to a warrant.

24  Q   And where – do you know which court that warrant came out

25  of?

1    A    I know it was – I have it in my records, sir.  I –

2    Q    So, it would be documented somewhere?

3    A    Yes, sir.

4    Q    I just haven't seen it.  That's why I asked.

5    A    Oh, okay.

6    Q    I want to come to your statement near the end that this

7    girl said that "E" used some force, but you can't remember

8    anything beyond that?

9    A    But the beginning I said that he choked her; then – so

10   then, it made her go back out.  So, when he didn't make – when

11   she didn't make the two hundred-dollar quota – I think it was,

12   roughly, around a hundred and twenty dollars – he told her to

13   get back on Mocospace, make some dates.  But prior to that, he

14   let her rest in the bed for a few minutes and then says, let's

15   go – let's go; you've got to make some more money.  And at

16   that point she said, I don't want to go.  All right.

17                    Can I stand up?

18             THE COURT:  I'm sorry?

19             THE WITNESS:  Can I stand up to –

20             THE COURT:  Uh-huh.

21             THE WITNESS:  And at that point, he leaned over on

22   the bed where she was laying and pushed like that.

23   BY MR. LAKE:

24   Q    Okay.

25                    And just for the record, you're putting your

1  hands together with your thumbs touching and pointing your

2  fingers downwards.

3  A    Yes, sir.

4  Q    Now, when you met with this girl on June 5th, you were in

5  the driver's seat and she was in the passenger seat?

6  A    Yes, sir.

7  Q    So you were a matter of, what, two feet away from her?

8  A    Give or take, yeah.

9  Q    Give or take.

10              Did you observe any bruising or other signs of a

11  struggle around her neck or face?

12  A    At that point, no, I did not.

13  Q    Okay.

14              Any time after did you?

15  A    I have not personally, no.

16  Q    Okay.  And you don't know whether this SANE exam has any

17  indications of choking or another struggle?

18  A    If it did, it would be in the SANE exam.

19  Q    But you just aren't sure?

20  A    No, sir.

21  Q    Okay.

22              When Mr. Larue was arrested, he didn't have any

23  guns; is that correct?

24  A    No.

25  Q    No drugs?

1   A   Not on him, no.

2   Q   Okay.

3              He's not being charged with a drug finding?

4   A   No.

5   Q   Okay.

6              He also didn't attempt to run?

7   A   No, sir.

8   Q   I believe the report says that there was – the arrest was

9   without incident.

10  A   Yes, sir.

11  Q   And to be clear the arrest – you were at a hotel?

12  A   Yes, sir.  We were at the Frontier Inn.

13  Q   And at the Frontier you had a manager or other employee

14  call the room to see if Mr. Larue was there?

15  A   Yes, sir.

16  Q   And then, you went upstairs on an elevator to go find him?

17  A   It was Level 3.  So, yes, we did take the elevator, yes,

18  sir.

19  Q   And he met you in the hallway?

20  A   Yes, sir.  He was coming towards the elevator.

21  Q   And either you or other officers were in – in uniform,

22  right?

23  A   Yes, sir.  We had a Midwest Tact there in full uniform.

24  It says HPD everywhere.  I believe the rest of us had reg

25  jackets on or our badge around our neck.

1    Q   Okay.  So, it was very clear you were officers?

2    A   Yes, sir.

3    Q   And when he saw you he didn't attempt to flee?

4    A   No, sir.  He did not.

5    Q   Okay.

6                IF I could just have one moment, Your Honor?

7        (Pause in the proceedings.)

8            MR. LAKE:  I think I just have two more questions, if

9    I could.

10   BY MR. LAKE:

11   Q   The first is, do you know if at any point charges have

12   been filed against the girl in juvenile court for prostitution

13   or in adult court for that matter?

14   A   You can't charge a juvenile with the crime of

15   prostitution.  So, it's – she was at the time, but then, I

16   don't know if – I don't know what the court's decided on that

17   one.

18   Q   I think I was confused by that answer.  You first said

19   it's not possible; then you said she was charged.  So, she was

20   charged for prostitution at first?

21   A   Yes, sir.  Sorry.  I –

22           THE COURT:  Meaning when you were in the car and she

23   was arrested at that time she was charged with prostitution?

24           THE WITNESS:  Yes, sir.  That would – yeah, I'm

25   sorry.  Yes, ma'am.

1  BY MR. LAKE:

2  Q   Okay.  But you're just not sure how it got resolved is

3  what you meant?

4  A   Yes, sir.  I'm – I'm sorry.  I didn't –

5  Q   Okay.

6  A   -- mean to confuse everybody.

7  Q   And then the other question is just were you aware when

8  you arrested Mr. Larue that he was injured, particularly that

9  he was limping?

10 A   He was limping, yes, sir.  I – we did notice it.

11 Q   Do you know why he was injured or what the nature of the

12 injury was?

13 A   I believe he stated that he was – he – I know he stated

14 something to me that he was injured, but I didn't know the

15 specific injury, no, sir.

16 Q   Okay.  Thank you.

17              I have no further questions.

18         THE COURT:  Anything further?

19         MR. EDWARDS:  I have one question, Your Honor.

20                  REDIRECT EXAMINATION

21 BY MR. EDWARDS:

22 Q   Officer Sadowski, when after Jane Doe was arrested –

23 A   Yes, sir.

24 Q   -- where was she taken to?

25 A   She was taken to – part of that she was taken to Texas

1  Children's Hospital, and then, she was taken to HPD Juvenile

2  Division where she was processed.

3  Q   Was she at any point placed into custody for the turmoil?

4  A   She was after – after – through HPD we have to go through

5  the HPD Juvenile system, so anytime you get a juvenile you

6  take her to HPD Juvenile, and then from there the Juvenile

7  Division will transport her to – or anybody – to Juvenile

8  Detention.

9  Q   Okay.  So, she stayed in there for some time?

10 A   Yes, sir.  She did.

11 Q   Thanks.

12              No more questions.

13         THE COURT:  Okay.  You may step down.

14         THE WITNESS:  Thank you, ma'am.

15         THE COURT:  You were going to admit – did I admit

16 this?

17              Yeah, I did.  Government Exhibit 1?

18         MR. EDWARDS:  Yes, Your Honor.

19         THE COURT:  Okay.

20              Do you have any further witnesses?

21         MR. EDWARDS:  No further witnesses, Your Honor, or

22 evidence.

23         THE COURT:  Okay.

24              Do you have anything?

25         MR. LAKE:  No, the Defense would rest, Your Honor;

1  just have argument.

2          THE COURT:  Okay.

3              Do you want to argue?

4          MR. EDWARDS:  Yes, Your Honor.

5              Well, Your Honor, I would like to first start

6  off by saying this is a presumption case under 18 USC 3142,

7  and the Government doesn't believe the burden as being to

8  rebut the presumption that the Defendant is a danger to

9  society or a flight risk.  This is a crime that involves a

10  juvenile, an adult having sex with a juvenile and prostituting

11  her, so this is a crime of violence that has a potential

12  minimum punishment of 15 years, a maximum of life, which is

13  something the Defendant hasn't faced before, and so, in that

14  regard we believe he – he is a risk for flight and hasn't

15  rebutted the presumption.  He was on parole at the time these

16  offenses occurred, and those – the basis of that parole was

17  his conviction for delivering methamphetamines.

18              The Defendant also has prior felony convictions

19  at the state level, Your Honor.  He's – he's not employed.

20  So, you know, because of these factors and because there has

21  been no evidence to rebut the presumption, the Government asks

22  that the Court hold Mr. Larue – that the Court detain

23  Mr. Larue until trial.

24          MR. LAKE:  Your Honor, in reviewing the Pretrial

25  Report, I will note that Pretrial's recommendation is that if

1  the parole matters are resolved in a way that there's not a

2  detainer they would be comfortable supervising Mr. Larue.

3  They recommend that he be heavily supervised.  I will say it's

4  more than a full page of rules they would place on him, but

5  they think he could be supervised.  I would agree.

6            At this point, there is a parole hold.   But if

7  there were not, he's a thirty-one year-old man that's been in

8  Houston his entire life.  There's nothing on his criminal

9  history that suggests flight from the police.  He didn't flee

10  from the police.  In this case, he could identify them as

11  officers after they had called up to his room, and he didn't

12  attempt to run in any way.

13            The facts in this case as they've been presented

14  to this Court at this point are 26 hours of text messages.

15  That's it.  They – I don't know if there's anything else out

16  there.  There is not a sign that this is a long-term violent

17  criminal, that if released on this host of conditions would

18  violate those conditions.  He has been in custody since his

19  arrest in June.  We're now in October, and this Court heard no

20  evidence that he's taken any steps to try and harm anyone from

21  in custody.  He hasn't tried to do it indirectly through

22  others.  So, I don't believe there is a reason to believe he

23  would be unsupervisable.

24            And as far as flight risk, I would disagree,

25   respectfully, with the Government that the mere charge itself

1  is enough to show flight risk.  We have a history of court

2  appearances, and there's no failures to appear listed in this

3  report.  There's none testified to, and there's no other

4  evidence of flight.

5         As the report notes, his whole family, including

6  his mother and son, are here.  His mother indicated that she

7  would be willing to let him live with her.  She would also co-

8  sign on a bond, if the Court deemed that necessary.

9         So, I do not believe that he is unsupervisable

10  and would ask this Court release him on the condition that

11  it's only if the parole hold is also lifted.

12         THE COURT:  And when is that supposed to be

13  determined?

14         MR. LAKE:  I don't have information on it.  I will

15  note the pretrial report says their attempts to contact parole

16  have also been unsuccessful.  I certainly hope to know the

17  answer soon, but right now I don't have any permission that.

18         THE COURT:  All right.  I'm going to take the matter

19  under advisement, and I will issue an order shortly.

20         Anything further?

21         MR. EDWARDS:  No, Your Honor.

22         MR. LAKE:  No, Your Honor.

23         THE COURT:  Do we want to do Arraignment?

24         MR. LAKE:  Yes, Your Honor, we're ready to move

25  forward with Arraignment.

1          And I lied.  I would ask that he have permission

2   to use the phone if he's going to be detained, just so that he

3   can let his family know he's no longer in state custody.

4          THE COURT:  Okay.

5          MR. LAKE:  Thank you.

6          THE COURT:  So, step forward and do the Arraignment.

7          You waive formal reading of the charges,

8   Mr. Lake?

9          MR. LAKE:  We do, Your Honor.

10         THE COURT:  Mr. Larue, have you had a chance to

11  discuss the charges against you with your lawyer?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  Are you ready to enter a formal pleading

14  at this time?  Yes or no?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  How do you plead to the Indictment?

17  Guilty or not guilty?

18         THE DEFENDANT:  Not guilty.

19         THE COURT:  A not guilty plea has been entered on

20  your behalf.

21         This case is set before Judge Sim Lake.  You're

22  set for jury trial at 1:00 p.m., on November 27th.

23         You don't need to sign it.

24         Anything else?

25         MR. LAKE:  I just – for clarity sake, the Marshals

1   were asking is the Court's plan to come back into court with

2   the ruling such that Mr. Larue should be brought back?

3           THE COURT:  No.

4           MR. LAKE:  All right.  Thank you.

5           MR. EDWARDS:  Thank you, Your Honor.

6           THE COURT:  You're welcome.

7               You're excused.  Court's adjourned.

8       (Proceedings concluded at 11:44 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4

5       I, Linda Griffin, court approved transcriber, certify that

6  the foregoing is a correct transcript from the official

7  electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10 /s/ Linda Griffin                    June 26, 2018
   Linda Griffin                            Date
11 Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862